ENDORSED
First Judicial District Court

AUG ~ 2 2011

Santa Fe, Rio Arriba &
Los Alamos Counties
Santa PO Box 2268
Santa Fe, NM 87504-2268

STATE OF NEW MEXICO
COUNTY OF SANTA FE
FIRST JUDICIAL DISTRICT COURT

STATE OF NEW MEXICO ex rel.
THE NATIONAL EDUCATION ASSOCIATION OF
NEW MEXICO, INC., a domestic nonprofit corporation,

       Plaintiff,

on behalf of the EDUCATIONAL RETIREMENT BOARD
and the STATE INVESTMENT COUNCIL,
arms of the STATE OF NEW MEXICO,

       Real Parties in Interest,

vs.                             No. D-0101-CV-2010-3863

AUSTIN CAPITAL MANAGEMENT, LTD.,
a Texas limited partnership;
KEYCORP, an Ohio corporation for profit; and VICTORY
CAPITAL MANAGEMENT, INC., a New York corporation
for profit,

       Defendants.

## FIRST AMENDED COMPLAINT AGAINST THE KEYCORP DEFENDANTS FOR BREACH OF FIDUCIARY DUTY, AIDING AND ABETTING BREACH OF FIDUCIARY DUTY, NEGLIGENCE AND PUNITIVE DAMAGES

Through undersigned counsel, the National Education Association of New Mexico, Inc.

("NEA-New Mexico") states the following First Amended Complaint against Austin Capital

Management, Ltd. ("Austin Capital") and the other Defendants on behalf of the Educational

Retirement Board and the State Investment Council, both arms of the State of New Mexico:

## NATURE OF ACTION

1.      Based upon personal knowledge for allegations as to itself and upon information and belief from investigation of counsel as to all other matters, NEA-New Mexico brings this First Amended Complaint on behalf of the Educational Retirement Board (ERB) and the State Investment Council (SIC) for damages that these state investing agencies suffered as a direct and proximate result of Austin Capital's decision to place public money with Bernard L. Madoff.  By allowing millions belonging to the ERB and the SIC to fall into the Madoff scheme, Austin Capital breached its fiduciary duty to ERB and SIC and, at the bare minimum, committed an act of professional negligence.  Defendants KeyCorp and Victory Capital Management, Austin Capital's parent companies, aided and abetted Austin Capital's breach of fiduciary duty.  Insofar as all the Defendants had a financial incentive to turn a blind eye to Madoff as a result of the lucrative hedge-fund fees, including "performance" fees based in part on what turned out to be Madoff's bogus earnings, all Defendants acted in reckless disregard to the consequences of their conduct, warranting punitive damages.

2.      The ERB and SIC invested millions in the ironically named Safe Harbor Fund, a hedge fund managed by Defendant Austin Capital Management, Ltd.  Unbeknownst to the ERB and SIC, Austin Capital placed a significant portion of the Safe Harbor Fund with the main vehicle for the Ponzi scheme, Bernard L. Madoff Securities.  In fact, Austin Capital never disclosed to its clients that it was in substance investing with Madoff, until after Madoff's arrest by federal authorities in December 2008.  Worse yet, Austin Capital doubled the ERB's and SIC's exposure to Madoff only months before the scheme came crashing down.  Still worse and showing its guilty state of mind, Austin Capital had a longstanding and profitable relationship

with Bernie Madoff dating back to 1990s, details of which Defendants have never disclosed to clients to this day and which has only come to light as a result of NEA-New Mexico's investigation.

3.      Austin Capital is a wholly-owned subsidiary of Defendant KeyCorp, a *Fortune 500* banking and investment behemoth headquartered in Cleveland, Ohio.  In April 2009, KeyCorp decided to shut Austin Capital's operations down in the aftermath of the Madoff debacle, but it remains in legal existence.

4.      According to KeyCorp's own determination as communicated in its 2009 annual report, clients of its subsidiary, Austin Capital, lost approximately $186 million in the Madoff scheme.  Of that, the ERB and SIC lost approximately $25 million combined.  Damages to the ERB and SIC that were the direct consequence of Defendants' conduct, however, exceed losses in the Madoff scheme because damages include the lost opportunity to invest in safe and productive assets.

## PARTIES, JURISDICTION, VENUE AND STANDING

5.      The ERB and the SIC, both arms of the State of New Mexico, are Real Parties in Interest, and this action is brought on their behalf to compensate them for the damages they suffered as a result of the Defendants' permitting money to be lost in the Madoff scheme.

6.      The ERB is an agency of the State of New Mexico charged with investing the retirement funds of New Mexico's public school employees, including public school teachers.

7.      The SIC is an agency of the State of New Mexico charged with investing the Land Grant Permanent Fund, the Severance Tax Permanent Fund and the Tobacco Settlement

Permanent Fund, among other funds, primarily to benefit public schools and higher educational institutions.

8.     NEA-New Mexico is a New Mexico domestic nonprofit corporation with its principal office at 2007 Botulph Road, Santa Fe, New Mexico, 87505.  NEA-New Mexico provides professional development, collective bargaining and other services to approximately 8,000 members across New Mexico.  The members are active and retired public school teachers, assistants, custodians, cafeteria workers and other public school employees as well as employees of various public higher educational institutions.

9.     NEA-New Mexico has standing to bring this First Amended Complaint on behalf of the ERB and SIC because Defendants' conduct actually injured the members of NEA-New Mexico by causing losses (via the ERB) to their retirement accounts and by impairing (via the SIC) the financial health of the public education system and higher educational system, where thousands of NEA's members work.

10.     Defendant Austin Capital Management, Ltd., is a Texas limited partnership with its principal office formerly at 5000 Plaza on the Lake, Suite 250, Austin, Texas 78746 but now at 127 Public Square, Cleveland, Ohio, 44114.  Austin Capital managed the Safe Harbor Fund, through which the ERB and the SIC lost millions in the Madoff scheme.

11.     Defendant KeyCorp is an Ohio corporation for profit with its principal office at 127 Public Square, Cleveland, Ohio, 44114.  As of March 31, 2011, KeyCorp was one of the nation's largest bank conglomerates, with consolidated total assets of over $90 billion and a net worth of nearly $10 billion.  On April 1, 2006, through its investment advisory unit, KeyCorp acquired Defendant Austin Capital Management, Ltd.

First Amended Complaint - Page 4 of 32

12.     Defendant Victory Capital Management, Inc. ("Victory Capital") is a New York corporation for profit with its principal office at 127 Public Square, Cleveland, Ohio, 44114. Victory Capital is KeyCorp's investment advisory unit, through which KeyCorp acquired Austin Capital.

13.     Austin Capital Management, Ltd.; KeyCorp; and Victory Capital Management, Inc. are sometimes collectively called the "KeyCorp Defendants."

14.     This Court has jurisdiction over the subject matter of and parties to this First Amended Complaint, and venue is proper in the County of Santa Fe.

## PROCEDURAL HISTORY

15.     This action is a continuation of *State ex rel. National Education Association, Inc. v. Austin Capital Management, Ltd.*, State of New Mexico, County of Santa Fe, First Judicial District Court, No. D-101-CV-2009-1492, originally filed on May 12, 2009 (the "2009 Action").

16.     Austin Capital removed the 2009 Action to the United States District Court for the District of New Mexico, but the federal court determined it lacked subject matter jurisdiction because the ERB and SIC, as arms of the State of New Mexico, are not "citizens" for purposes of diversity of citizenship. *New Mexico ex rel. Nat'l Educ. Assoc. v. Austin Capital Mgmt.*, 671 F.Supp. 2d 1248 (D.N.M. 2009) (remanding 2009 action to state court).

17.     After remand, the state court dismissed the 2009 Action without prejudice on May 14, 2010.

18.     NEA New Mexico filed the original complaint under this Cause No. D-0101-CV-2010-3863 on November 10, 2010. Both the original complaints in the 2009 Action and this one included claims under the New Mexico Fraud Against Taxpayers Act, NMSA 1978, Sections 44-

First Amended Complaint - Page 5 of 32

9-1 to 44-9-14 (2007) ("FATA"), in addition to common law claims, and asserted NEA-Mexico's status as *qui tam* plaintiff under FATA.

19.     A significant reason for this First Amended Complaint is to disclaim NEA-New Mexico's status as *qui tam* plaintiff under FATA and to cease pursuing any FATA claim related to ERB's and SIC's Madoff-related losses.

## BACKGROUND AND FACTUAL SUMMARY

*How Austin Capital Lost Millions of ERB and SIC Money with Madoff*

20.     On December 11, 2008, Bernard L. Madoff was arrested by federal authorities, and over the next days and weeks, details of Madoff's Ponzi scheme emerged.

21.     According to a written statement issued to clients on December 15, 2008, Austin Capital admitted that "a hedge fund managed by Mr. Madoff" had been "a continuous investment" for the Austin Capital All Seasons Fund and Austin Capital Safe Harbor Fund since 1997. The statement went on to say that, as of December 1, 2008, Austin Capital's investment with Madoff represented 7.5% of the Safe Harbor Fund.

22.     A short time later, Austin Capital determined that its clients, including the ERB and SIC, lost approximately $186 million in the Madoff scheme. Nearly $100 million of Austin Capital's total investment in Madoff was made in March 2008, roughly doubling exposure right before the Ponzi scheme collapsed. The two New Mexico investing agencies together lost nearly $25 million, with the ERB's having suffered nearly a $10 million Austin-Madoff related loss and the SIC's having suffered about a $15 million loss.

*How Austin Capital Failed to Provide the Due Diligence It Promised*

23.     A hedge fund is an investment fund open to a limited class of institutional or wealthy individual investors, undertaking a wider range of investment and trading activities than other investment funds.  A hedge fund of fund manager like Austin Capital, in turn, manages portfolios of hedge fund investments.   To promote its middle position between institutional investors like the ERB and the SIC and underlying hedge funds, Austin Capital sold expertise in performing an investigation into the suitability of a hedge fund and into the risk associated with it.  This process is known as **"due diligence."**

24.     In reaction to disclosures of the Madoff scheme, Austin Capital itself reiterated the importance of due diligence, services it supposedly provided as a hedge fund of funds manager.  In a statement regarding Madoff issued to clients, including the ERB and the SIC, on December 18, 2008, Austin Capital (also called "ACM") stated the following:

> **Since its founding in 1993, ACM has followed a <u>conservative approach</u> to investments, <u>incorporating extensive due diligence</u>, in-depth research, disciplined portfolio construction, and a profound regard for the fiduciary obligations to its investors.**

25.     The December 18 statement went on to say that: **"ACM firmly believes its due diligence policies and procedures are among the strongest in the industry."**

26.     Also in reaction to disclosure of the Madoff scheme, Jay Van Ert, an Austin Capital executive, made a presentation to the Investment Committee of the ERB on January 8, 2009, which on that day was chaired by State Treasurer James B. Lewis, who also sits on the State Investment Council by virtue of his office.  Even though Austin Capital's due diligence process on the Madoff investment was the topic of discussion, Mr. Van Ert declined to leave

behind key documents related to due diligence on Austin Capital's Madoff investment, such as a "Due Diligence Questionnaire." Mr. Van Ert said he was not "comfortable" leaving the due diligence related documents with the ERB, notwithstanding the ERB's request to retain them and his reference to them as important "source documents."

27. A key purpose of due diligence—and therefore a critical reason to hire a firm like Austin Capital—is to detect and avoid fraud. Because engaging a fund of funds manager like Austin Capital entails a costly layering of fees—as underlying hedge funds as well as the fund of funds manager all charge fees on the same invested money—there is, in truth, little reason to engage a fund of funds manager but for the due diligence and fund diversification.

### How Austin Capital Profited Through Management Fees on Its Madoff Investment

28. Like many investment funds, Austin Capital charged clients like the ERB and SIC a percentage management fee on assets under management (AUM) in exchange for the due diligence and other services it claimed to provide. As described in the written material accompanying Mr. Van Ert's presentation to the ERB's Investment Committee on January 8, 2009, Austin Capital received a "Management Fee" from its clients of either (a) 1.5% of AUM (known as "Option 1") with no performance fee or (b) 1.0 % of AUM with a 10% performance fee on profits (known as "Option 2"). Under both Options 1 or 2, clients received "account statements" on a "monthly" basis, reporting the management fee and deducting it from the client's account.

29. As Mr. Van Ert's written material went on to say, in addition to monthly "account statements," Austin Capital also provided clients "performance reporting" in the form of "monthly updates" and a "quarterly letter". As of December 2008, Austin Capital had

approximately $2.6 billion under management, putting Austin Capital's total fee revenue in the tens of millions of dollars annually.

30.   Because Austin Capital made its money as a percentage of assets under management, every dollar invested with Madoff over the years created a monthly revenue and profit stream to Austin Capital in the form of management fees.  Under Option 2's performance fee provision, Austin Capital made a windfall over the years on Madoff's fictitious returns.  In short, as Madoff reported fake earnings, Austin Capital took "performance" fees for the supposedly great job it was doing in managing assets.

### How Austin Capital Misleadingly Sold Itself as a Due Diligence Powerhouse

31.   Austin Capital's statements in December 2008 and January 2009, stressing the importance of due diligence and connecting them directly to management fees, were not outliers. As early as 1999, the firm's official web site promised: "Austin Capital provides **continuous due diligence** on these hedge funds, and their respective managers, for the funds it manages."

32.   Up until Austin Capital ceased operations in April 2009, the web site continued to trumpet the skills of Kyle McDaniel, Austin Capital's Chief Risk Officer, as "**architect of the firm's proprietary risk model, which includes underlying funds in its correlation analyses and shock-test scenarios.**"  According to Austin Capital, a centerpiece to Mr. McDaniels' professional background was that, prior to joining the firm, "**he designed and implemented a due diligence system for evaluation of hedge fund managers.**"

33.   Reflecting statements in the web site, Mr. Van Ert, in his January 8, 2009, presentation to the ERB's Investment Committee, also emphasized the importance of Kyle McDaniel's role in the detection and prevention of "fraud" in the process of due diligence.

34.     Drawing a sharp contrast to the portrait of professional due diligence Austin Capital painted, the firm's actual due diligence in regard to money that wound up with Madoff was largely, if not wholly, absent.  In effect, Austin Capital charged management fees to the ERB and the SIC and yet performed no meaningful due diligence on the Madoff investment.

***How KeyCorp's Bonus System Created An Incentive to Turn a Blind Eye to Madoff***

35.     Worse yet, Austin Capital's parent company, KeyCorp, created the financial incentive for executives to ignore red flags regarding Madoff's operations.   KeyCorp's acquisition of Austin Capital in 2006 was part of an overall plan to expand its business away from traditional banking into money management, which KeyCorp executives believed would be more profitable than banking.  KeyCorp executives especially liked the hedge fund business with its fat fee structure, based on charging customers a percentage fee of assets under management even if the investment loses money.  It bears repeating that hedge funds like Austin Capital earn a management fee, even if their investments are losing money.

36.     KeyCorp, however, faced a big problem in trying to expand its business into hedge funds.  As part of the well-publicized backdrop to the global financial crisis, hedge fund managers expected big pay packages, which did not fit with traditional banking practices.  So KeyCorp decided to allow its money management unit, Victory Capital Management, to create a new bonus system, which fit better with the high-flying hedge fund culture.  KeyCorp acquired Austin Capital as part of its push into hedge funds and used Austin Capital as a vehicle for the Victory unit's new bonus system.

37.     As reported in *Pensions & Investments,* "Victory Changes Paying Off," February 6, 2006:

In an interview, Robert L. Wagner, Victory's president and CEO, said his firm is poised to benefit this year from extensive restructuring in 2005, which was fully backed by KeyCorp—the Cleveland-based bank that owns Victory.

\* \* \*

The Cleveland-based bank has been "terrific," backing his efforts to craft a new compensation plan "different from anything put in place before" at Key, while providing resources and support to push through Victory's restructuring. It's "being able to run our business like a separate business, but being able to use all the resources" of the parent company, he said.

While declining to detail Victory's new compensation package, Mr. Wagner said focusing the firm's product line on strongly performing strategies has **boosted profits,** leaving the firm better positioned to compete for top talent.

\* \* \*

Victory's new bonus structure is "totally outside the bank structure" . . ., Thomas M. Seay, Victory's fixed-income chief investment officer, said in an interview. **"We've got a lot more skin in the game," and that has left portfolio managers "highly motivated,"** he said.

**Mr. Wagner pointed to Victory's deal with Austin [Capital] as an example of aligning incentives.**

38.    KeyCorp's push, through its Victory unit, to give Austin Capital's employees bonuses tied to profits led directly to mixing sales and due diligence responsibilities in the same jobs, a dangerous combination.  If a person's bonus pay is tied to profits, which in turn is tied to the amount of money under management, then it literally does not pay to ask hard questions about where a client's money goes.  So long as things appear okay on paper, fees are charged; profits earned, and bonuses paid.  In the event an investment goes south, a hedge fund manager at Austin Capital still got to keep previously paid bonuses because there was no so-called "claw back" provision, a means to "claw back" fees and bonuses made on investments that turn out badly.

First Amended Complaint - Page 11 of 32

39.     Details of the mixing of sales and due diligence responsibilities at Austin Capital
came to light in a lawsuit filed in April 2009 against Justin Balthrop, an employee who decided
to abandon Austin Capital after the Madoff losses became clear.  Notwithstanding the fact the
KeyCorp in Cleveland was at the same time making the decision to shut Austin Capital's
operations down for good in the aftermath of Madoff, Mr. Balthrop's superiors in Texas sued
him.  As amply shown in court papers, not only did Austin Capital combine sales and due
diligence responsibilities—according to the affidavit of an executive, Mr. Balthrop was one of
the three Senior Analysts at the company and maintained "**responsibility for research and due
diligence**" as well as "**investor relations**" and "**business development**"—but also the
Defendant based bonus compensation solely on fee generation.  According to pleadings, Mr.
Balthrop was the beneficiary of a grant of restricted stock in KeyCorp, and the suit's main
purpose was to restrict Mr. Balthrop's use of "pricing and profitability information," alongside
other sales information.

40.     Confirming the fact that Austin Capital mixture of sales and due diligence
responsibilities was directly linked to the Madoff losses, Mr. Van Ert's written material
presented to the ERB's Investment Committee on January 8, 2009, contains an organizational
chart titled the "Austin Capital Team" as well as an appendix containing biographies.  In the
chart, Mr. Balthrop reports to Mr. Van Ert as Portfolio Manager in charge of Non-Directional
Strategies.  In turn, Mr. Van Ert admitted to the ERB's Investment Committee that he had
personally approved increasing Austin Capital exposure to Madoff by nearly $100 million in
March 2008.

First Amended Complaint - Page 12 of 32

41.     In sum, by giving people like Mr. Van Ert and his underlings like Mr. Balthrop bonuses, including grants of KeyCorp common stock, based solely on profitability, KeyCorp and Victory Capital Management created an Austin Capital team that was "highly motivated" to turn a blind eye to Bernard Madoff and his investments.

42.     Still worse, it appears Austin Capital made a conscious choice to give Madoff in particular a free pass on due diligence, given that executives of Austin Capital had maintained a cozy relationship with him.

43.     A former executive of Austin Capital's, Pierre L. Schoenheimer, maintained a close relationship with Bernard Madoff and his family for years.  In the 1990s, Austin Capital marketed a fund of hedge funds called Austin Capital & Radix Sterling Fund, Ltd. ("Austin Capital Radix").   Pierre Schoenheimer co-founded Austin Capital Radix, and one of Schoenheimer's companies served as the managing partner of Austin Capital Radix.  Pierre's wife, Idee German Schoenheimer, published a 1996 cookbook with Ruth Madoff, Bernard's wife; and the Madoffs and Schoenheimers traveled in the same New York social circles, until Madoff's arrest in December 2008.

44.     A relative of Pierre and Idee's, Linda Schoenheimer McCurdy, worked as a registered investment representative for Cohmad Securities Corporation ("Cohmad"), which Bernard L. Madoff partly owned and which shared office space with Bernard L. Madoff Investment Securities, LLC ("BLMIS"), the main vehicle for the Ponzi scheme.   The Massachusetts Securities Division filed an administrative complaint against Cohmad on February 11, 2009, charging the company with serving as a conduit for money directed into the scheme and listed Linda Schoenheimer McCurdy as an "involved and related party."

First Amended Complaint - Page 13 of 32

45.     As recently as 2008, Pierre Schoenheimer publicly promoted his role as co-founder of Austin Capital Radix, and, in the mid-1990s, a trust in the name of Linda Schoenheimer McCurdy held common stock in another Pierre Schoenheimer company called Radix Ventures, Inc.  In addition to the Schoenheimer connection, John Sauder, a former Austin Capital partner and co-founder who left the firm in 2004 after a ten-year stint, also maintained a business relationship with BLMIS, until Bernard L. Madoff was arrested in December 2008.

46.     Whether one blames Austin Capital's unwillingness to perform due diligence regarding Madoff on the longstanding relationship company executives had with the fraudster or on the perverse incentives that the KeyCorp Defendants created with their bonus compensation package, the firm's obvious failure to act on numerous "red flags" shows a reckless absence of due diligence.  The "red flags" to Madoff's scheme included the following facts:

(a) <u>Madoff reported improbably smooth investment returns</u>—the investment returns that Madoff reported followed an abnormally consistent and positive trajectory, in both up and down markets and with an absence of volatility that was difficult if not impossible to explain; Madoff had only five months of negative returns in the past twelve years, even through the bursting of the late 1990s stock market bubble;

(b) <u>Madoff adopted unusual practices that eliminated transparency</u>—Madoff acted as his own prime broker, while most legitimate hedge funds use large investment banks, such as Goldman Sachs and JP Morgan as their prime brokers; ran his own back office operations instead of employing third party administrators and custodians; and limited access to his books and records;

(c)   Madoff's participation in the market did not match what he claimed—there was insufficient trading activity in the put and call options Madoff claimed to be using in great volume, making it not only impossible to corroborate his claims but also reasonably detectable that Madoff had never told the truth about his strategy;

(d) Legitimate investment funds using the same strategy that Madoff supposedly used did not post similar results—other funds using a "split-strike conversion" strategy, which Madoff claimed was his approach and which entails the buying and selling of put and call options on stock alongside stocks themselves, did not generate smooth returns comparable to Madoff's reported returns;

(e)   Madoff's compliance measures were glaringly weak—despite the size and scale of the Madoff's operation, his auditors, Friehling & Horowitz, employed three people (only one was an active CPA, one was a secretary, and the third was retired and living in Florida) and operated out of a 13' by 18' storefront office in New City, New York, a small town north of New York City; Mr. Frieling, the CPA, was not registered with the Public Company Accounting Oversight Board, which was created under the Sarbanes-Oxley Act of 2002 to help detect fraud;  Madoff's comptroller was based in Bermuda, while most legitimate hedge funds have in-house comptrollers;

(f)   Readily available media reports raised questions about Madoff—on May 7, 2001, *Barron's* published an article entitled "Don't Ask, Don't Tell: Bernie Madoff is so secretive, he even asks his investors to keep mum," which listed numerous "red flags" including dubious returns using the "split-strike conversion" strategy; also in May 2001, an article in *MAR/Hedge*, a hedge fund industry publication, entitled "Madoff Tops

Charts; Skeptics Ask How," interviewed a dozen financial professionals who questioned the smoothness of and lack of volatility in Madoff's returns and also suggested Madoff may have been illegally subsidizing returns.

47.    Furthermore, simple but powerful evidence that Austin Capital did not perform meaningful due diligence is how hedge fund professionals, who actually did their homework, detected and avoided the Ponzi scheme.  Famously, whistle blower Harry Markopolos, who began reporting the Madoff fraud to the Securities and Exchange Commission ("SEC") back in 2000, originally detected Madoff's fraud with a straight-forward quantitative analysis. Furthermore, several prominent hedge fund of funds managers steered clear of Madoff over the years, including Goldman Sachs Asset Management, Morgan Stanley, JPMorgan Asset Management and the asset management unit of BNY Mellon Bank.

48.    At all material times and in reckless disregard of the truth, Austin Capital failed to disclose to the ERB and the SIC the true fact that it failed to perform meaningful due diligence with regard to investments placed with Madoff and BLMIS.  Because due diligence was a material reason to hire Austin Capital in the first place, the ERB and the SIC's reliance may be presumed.    In addition to its omissions of material fact, Austin Capital affirmatively misrepresented its expertise and focus on due diligence, including in marketing material such as its official web site and offering memoranda, and the ERB and the SIC reasonably relied upon Austin Capital's professed expertise and focus on due diligence.

49.    Reinforcing these facts, in his January 8, 2009, presentation to the ERB's Investment Committee, Mr. Van Ert never disclosed to its clients the relationship to Bernard Madoff of former Austin Capital executives like Pierre Schoenheimer and John Sauder. Mr. Van

First Amended Complaint - Page 16 of 32

Ert did admit to the Investment Committee, however, that Austin Capital had invested with Madoff based significantly on reputation, saying that "Bernie Madoff was well known in the industry and at one time served as chairman of NASDAQ. . . ."

50.    Austin Capital's failure to perform meaningful due diligence, its failure to disclose that fact and its affirmative misrepresentations regarding due diligence all contributed to bringing about the losses that the ERB and the SIC suffered in the Madoff scheme.  As alleged in this First Amended Complaint, Austin Capital's acts and omissions were a cause of those losses and were reasonably connected as a significant link to them.

51.    Furthermore, KeyCorp's and Victory Capital Management's adoption of a new bonus compensation plan after its acquisition of Austin Capital and their encouragement of the mixing of sales and due diligence responsibilities also contributed to bringing about the losses that the ERB and the SIC suffered in the Madoff scheme by creating an incentive to turn a blind eye to Madoff.  As alleged in this Complaint, KeyCorp's and Victory Capital Management's acts and omissions were a cause of those losses and formed a significant link to them.

## OTHER SUBSTANTIVE ALLEGATIONS

**More on the Madoff Scheme and its Victims**

52.    Although unprecedented in size—right before Madoff's arrest, BLMIS had issued account statements reporting a fictitious total balance of nearly $65 billion—Bernard L. Madoff's scheme was a typical affinity scam and Ponzi scheme in other respects.  A Ponzi scheme, named after early twentieth century fraudster Charles Ponzi, pays returns on early investment with money obtained from new investment.  An affinity scam exploits a particular ethnic or social group.

First Amended Complaint - Page 17 of 32

53.    Much as Ponzi's scheme started with his own Italian immigrant community, Madoff's scheme claimed many of its victims among the American Jewish community, where he and his wife Ruth had established a sterling social reputation by extensive charitable work with various religious, artistic and educational institutions.   Madoff also established a network of shills in various Jewish country clubs in New York, Florida, Minnesota and elsewhere.   For this reason, a vast majority of Madoff victims were individuals or families, rather than institutional investors like the ERB and the SIC.   Importantly, it appears that Austin Capital's relationship with Madoff started on an affinity basis.   The cookbook that Idee Schoenheimer and Ruth Madoff published by vanity press together in 1996 was titled *The Great Chefs of America Cook Kosher: Recipes From America's Greatest Restaurants*.

54.    Madoff expanded the scope of the fraud through what were, in effect, institutional shills or feeder funds.   Madoff marketed mostly through exclusive and highly lucrative arrangements with these feeder funds, coupling an air of exclusivity with powerful sales incentives.   As of 2001, Madoff's publicly acknowledged feeder funds included Fairfield Greenwich and Tremont, through which Austin Capital made its Madoff investment.

55.    While scams typically exploit affinity or reputation, which is to say gut decision making, basic standards of due diligence emphasize objective criteria and quantitative analysis, and any reasonably skilled fund of funds manager should use objective due diligence criteria. Most, if not all, investment managers in the U.S. who examined a potential investment with Madoff under an objective standard successfully avoided the fraud.

56.     In an article entitled "Homework Saves Crying Over Madoff: Institutions heeded red flags raised by hedge funds of funds," *Pensions & Investments* magazine reported in its online edition on December 22, 2008:

> Bernie Madoff stood little chance of luring U.S institutions into his alleged $50 billion Ponzi scheme because elite U.S. hedge fund-of-funds managers stood solidly in the way.
>
> **The due diligence of hedge funds of funds that specialize in managing mandates for U.S. pension funds, endowments and foundations found too many inconsistencies in the trading strategy managed by Bernard L. Madoff Investment Securities LLC, New York.** However, a few smaller hedge funds of funds were invested in so-called feeder funds, single-manager funds managed by Mr. Madoff's firm.
>
> "The fact that so many institutional investors' hedge fund-of-funds managers insisted on transparency and therefore avoided Bernie's is a testament to the quality of their due diligence. They protected institutional investors from getting involved in this fraud," said Eric Weber, chief operating officer and principal of Freeman & Co., New York, a boutique investment bank.
>
> Among those steering clear were the largest hedge fund-of-funds managers of U.S. institutional assets, including Pacific Alternative Asset Management Co., K2 Advisors LLC, Mesirow Advanced Strategies Inc., Goldman Sachs Asset Management, Morgan Stanley, JPMorgan Asset Management, UBS Global Asset Management, BlackRock Inc., Harris Alternatives LLC and the asset management unit of BNY Mellon Bank.

(emphasis supplied.)

57.     In an article entitled "Who Isn't a Madoff Victim? The List is Telling," *Fortune* magazine and CNNMoney.com jointly reported on December 19, 2008:

> [c]ertain types of investors seem to be absent . . . from the casualty list.
>
> That's no accident, argues James Hedges IV of LJH Global Investments, a boutique firm that invests in hedge funds and private equity for high-net-worth families. **In other words, score one for the big institutions that stick to standard rules rather than allowing their managers to invest on personal connections or hunches.**

"There's no Duke Endowment [among the list of Madoff investors]," Hedges says. "There's no Harvard management, there's no Yale, there's no Penn, there's no Weyerhauser, no State of Texas or Virginia Retirement system."

The reason is simple, in Hedges' view. **Letting Madoff manage your money "wouldn't pass an institutional-quality due diligence process," he says. "Because when you get to page two of your 30-page due diligence questionnaire, you've already tripped eight alarms and said 'I'm out of here.'"**

(emphasis supplied.)

58.     But for Austin Capital's failure to perform due diligence regarding Madoff as promised, its failure to perform due diligence to standards of reasonably skilled fund of funds managers and its failure to disclose the truth about these facts, the ERB and the SIC would have avoided losing money in the Madoff scheme.

**More on Austin Capital's Investing with Madoff**

59.     By investing in Madoff through Tremont, Austin Capital made an already opaque transaction even less transparent and also exposed clients to an unconscionable triple layering of costs and fees, with Madoff, Tremont and Austin Capital each getting a piece of the action, even if things had gone according to plan and no scam had occurred.   The triple layer arrangement was in itself dishonest.   The best that can be said of Austin Capital's conduct was that it hoped to pawn off due diligence responsibility to Tremont, without ever disclosing the true structure of the arrangement to clients.   Yet, Austin Capital never told clients it was going to delegate due diligence to Tremont and any attempted delegation would itself constitute a failure to disclose a material fact, again linking Austin Capital's acts and omissions to the Madoff related losses in a significant way.

**More on Austin Capital's Failure to Perform Meaningful Due Diligence**

60.    For years, there had been numerous warning signs that caused Madoff to fail the due diligence inquiries of many other fund of funds managers.

### —The 1992 SEC Litigation

61.    In 1992, the Securities and Exchange Commission (SEC) filed a lawsuit against accountants Frank Avellino and Michael Bienes, who sold $441 million in unregistered securities to 3,200 people beginning in 1962, promising them returns of 13.5% or higher, and invested the money entirely with Madoff.  As a result of the SEC investigation, Avellino and Bienes agreed to shut down their business and reimbursed their clients.  No action was taken against Madoff.

### —The 1999 Markopolos Warnings

62.    In May 1999, Harry Markopolos, an investment consultant with experience managing the "split-strike conversion" strategy supposedly used by Madoff, sent a letter to the SEC describing how Madoff could not have generated the returns Madoff claimed using the split-strike conversion strategy. To Markopolos, it appeared virtually impossible to legitimately achieve the lack of volatility in returns that Madoff reported, which is to say the abnormal smoothness in Madoff's claimed returns.

### —The May 2001 *MAR/Hedge* Article

63.    In May 2001, the article "Madoff Tops Charts; Skeptics Ask How" appeared in *MAR/Hedge*, a semi-monthly newsletter reporting on the hedge fund industry.  The article reported:

What is striking to most observers is not so much the annual returns—which, though considered somewhat high for the strategy, could be attributed to the firm's market making and trade execution capabilities—but the ability to provide such smooth returns with so little volatility.

The best known entity using a similar strategy, a publicly traded mutual fund dating from 1978 called Gateway, has experienced far greater volatility and lower returns during the same period.

64.    The *MAR/Hedge* article also identified Tremont as one of Madoff's largest feeder funds.

65.    Responding to questions posed by *MAR/Hedge* reporter Michael Ocrant, including an accusation that Madoff may have been subsidizing returns from other parts of his brokerage business, an illegal practice on its own, Bernard Madoff ended his answer with the statement: "The strategy is the strategy and the returns are the returns."

### —The May 2001 Barron's Article

66.    On May 27, 2001, *Barron's*, one of America's leading financial publications, published the article titled "Don't Ask, Don't Tell: Bernie Madoff is so secretive, he even asks his investors to keep mum." *Barron's* reported:

[Private accounts managed by Madoff] have produced compound average annual returns of 15% for more than a decade. Remarkably, some of the larger, billion-dollar Madoff-run funds have never had a down year. When *Barron's* asked Madoff how he accomplishes this, he says, "It's a proprietary strategy. I can't go into it in great detail."   Nor were the firms that market Madoff's funds forthcoming.

\* \* \*

Still, some on Wall Street remain skeptical about how Madoff achieves such stunning double-digit returns using options alone. Three options strategists for major investment banks told Barron's they couldn't understand how Madoff churns out such numbers using this strategy. Adds a former Madoff investor:

"Anybody who's a seasoned hedge-fund investor knows the split-strike conversion is not the whole story. To take it at face value is a bit naïve."

\* \* \*

The lessons of Long-Term Capital Management's collapse are that investors need, or should want, transparency in their money manager's investment strategy. But Madoff's investors rave about his performance—even though they don't understand how he does it. "Even knowledgeable people can't really tell you what he's doing," one very satisfied investor told *Barron's*. "People who have all the trade confirms and statements still can't define it very well." This investor declined to be quoted by name. Why? Because Madoff politely requests that his investors not reveal that he runs their money.

What Madoff told us was, "If you invest with me, you must never tell anyone that you're invested with me. It's no one's business what goes on here," says an investment manager who took over a pool of assets that included an investment in a Madoff fund. "When he couldn't explain to my satisfaction how they were up or down in a particular month," he added, "I pulled the money out."

### —The 2005 Markopolos Warning

67.     Based on mostly publicly available information and on information certainly available to Austin Capital, on November 7, 2005, Markopolos submitted another letter to the SEC, entitled "The World's Largest Hedge Fund is a Fraud," in which he set forth in detail how Madoff's returns could not be real. Markopolos reported 29 red flags, each of which Austin Capital reasonably should have been capable of detecting. The red flags, as excerpted from the letter, include among others:

• [W]hy would B[ernard] M[adoff] settle for charging only undisclosed commissions when he could earn standard hedge fund fees of 1% management fee + 20% of the profits?

\* \* \*

• The third party hedge funds and fund of funds that market this hedge fund strategy that invests in BM don't name and aren't allowed to name Bernie Madoff as the actual manager in their performance summaries or marketing literature . . . .

Why the need for such secrecy? If I was the world's largest hedge fund and had great returns, I'd want all the publicity I could garner and would want to appear as the world's largest hedge fund in all the industry rankings.

\* \* \*

• It is mathematically impossible for a strategy using index call options and index put options to have such a low correlation to the market where its returns are supposedly being generated from. This makes no sense!

\* \* \*

• BM's performance numbers show only 7 extremely small [monthly] losses during 14 1/2 years and these numbers are too good to be true. The largest one month loss was only -55 basis points (-0.55%) or just over one-half of one percent! And BM never had more than a one month losing streak!

\* \* \*

• Madoff does not allow outside performance audits.

\* \* \*

• Madoff returns are not consistent with the one publicly traded option income fund with a history as long as Madoff's.

\* \* \*

• And why do these third parties fail to mention Bernie Madoff in their marketing literature? After all he's the manager, don't investors have a right to know who's managing their money?

\* \* \*

• BM goes to 100% cash for every December 31st year-end according to one FOF invested with BM. This allows for "cleaner financial statements" according to this source. Any unusual transfers or activity near a quarter-end or year-end is a red flag for fraud.

## —The 2007 Aksia Investigation and Other Red Flags

68.    In 2007, investment adviser Aksia LLC urged clients not to invest in Madoff feeder funds after performing due diligence and discovering several red flags, which include:

First Amended Complaint - Page 24 of 32

• Madoff's comptroller was based in Bermuda, whereas most mainstream hedge funds have their own in-house comptrollers

• Madoff's auditor, Friehling & Horowitz, operated out of a 13x18-foot location and included one partner in his late 70s who lived in Florida, a secretary, and one active accountant, whereas most hedge funds are audited by a name accounting firm.

• Aksia discovered the 2005 letter from Markopolos to the SEC described above.

69.     Aksia prepared its client advisory after, among other things, reviewing the stock holdings of Madoff Securities that were publicly reported in quarterly statements filed with the SEC. Aksia concluded that the holdings appeared to be too small to support the size of the assets Madoff claimed to be managing.

70.     Additionally, in a December 13, 2008 article in *The New York Times*, Robert Rosenkranz, principal of hedge fund adviser Acorn Partners, was quoted as saying, "Our due diligence, which got into both account statements of [Madoff's] customers and the audited statements of Madoff Securities, which he filed with the S.E.C., made it seem highly likely that the account statements themselves were just pieces of paper that were generated in connection with some sort of fraudulent activity."

71.     A December 13, 2008 article in *The Wall Street Journal* quoted Chris Addy, founder of Castle Hall Alternatives, which screens potential hedge fund investments for clients, as follows: "There was no independent custodian involved who could prove the existence of assets. . . There's a clear and blatant conflict of interest with a manager using a related-party broker-dealer. Madoff is enormously unusual in that this is not a structure I've seen."

72.     The secrecy that Madoff required alone was sufficient reason to avoid investing with him. On January 17, 2009, the *New York Times* reported:

First Amended Complaint - Page 25 of 32

"It's a very strange set-up, since most prospectuses disclose the names of the actual portfolio managers," said Drago Indjic, a project manager at the Hedge Fund Center of the London Business School. "If you've been in the industry, this doesn't pass the smell test."

73.     Austin Capital not only acquiesced to the conspiracy of silence among members of the Madoff feeder network but also contributed to it by, among other actions, failing to disclose to clients the longevity and depth of its knowledge of and relationship with Madoff. Austin Capital reasonably should have been capable of performing the same due diligence that Aksia, Acorn Partners and others performed. Had Austin Capital done so, the company would have either detected the Madoff fraud as Markopolos and others did or at least avoided investing with Madoff, as so many fund of funds managers and investment consultants did.

74.     During the time Austin Capital had directed monies belonging to the ERB and the SIC into investments with Madoff and BLMIS, Austin Capital collected management fees on those monies and thus benefited financially as part of Madoff's lucrative feeder network.

## COUNT I

### For Breach of Fiduciary Duty (Against Austin Capital) and
### For Aiding and Abetting Breach of Fiduciary Duty (Against the Other Defendants)

75.     The NEA-New Mexico realleges and incorporates Paragraphs 1 through 74 by reference.

76.     During the time Austin Capital managed money on behalf of the ERB and the SIC, it owed the investing agencies a fiduciary duty. It remained in a fiduciary relationship throughout that time, because Austin Capital handled the financial affairs of the ERB and the SIC with regard to the money invested with the company, because Austin Capital collected fees based on the amount of money it handled on behalf of the ERB and the SIC, because Austin

Capital knew, or should have known, that the ERB's money is held in trust for the pension benefit of New Mexico's public school teachers, other school employees and employees of state educational institutions and because Austin Capital knew, or should have known, the SIC's money is held in trust primarily for the public schools and State educational institutions.

77.     Furthermore, Austin Capital acknowledged that it owed all clients a fiduciary duty in, among other documents, the company's Code of Ethics, which all senior personnel must certify that they have read.  An excerpt from Austin Capital's Code of Ethics follows:

> All Access Persons [senior personnel] owe a fiduciary duty to Austin's clients . . . . Access Persons must place the interest of clients first and avoid activities, interests and relationships that might interfere with the duty to make decisions in the best interest of clients.

78.     As part of its fiduciary duty, Austin Capital had a duty to disclose material facts to the ERB and the SIC and to exercise reasonable care, skill and caution.

79.     By receiving management fees partly in exchange for due diligence services it never performed with regard to the Madoff investment, or performed inadequately and in a materially different way from that represented to clients, Austin Capital breached its fiduciary duty.

80.     By also failing to disclose the material truth about its longstanding relationship with Madoff, by failing to disclose the very fact of the investment with Madoff, by failing to disclose the unconscionable triple-layer fee arrangement with Madoff and Tremont and by failing to disclose its lack of meaningful due diligence regarding Madoff and BLMIS, Austin Capital also breached its fiduciary duty.

81.     In addition to omissions of material fact, Austin Capital also made affirmative misrepresentations of material fact regarding its expertise and focus on due diligence in marketing material, such as its official web site, and its offering memoranda, once again breaching its fiduciary duty.

82.     Finally with regards to breach, Austin Capital breached its fiduciary duty to the ERB and the SIC by failing to perform due diligence with regard to Madoff and BLMIS with reasonable care, skill and caution.

83.     By establishing the bonus compensation scheme subsequent to the acquisition of Austin Capital that created a profit motive to turn a blind eye to Madoff—which is to say "skin in the game," as a Victory executive put it—and by promoting the mixing of sales and due diligence responsibilities in the same job, KeyCorp and Victory Capital Management aided and abetted Austin Capital's breach of fiduciary duty.

84.     Additional facts showing that KeyCorp and Victory Capital Management aided and abetted Austin Capital's breach of fiduciary duty include the fact that the bonuses were, in part, grants of KeyCorp common stock and the fact that both KeyCorp's and Victory Capital's name and logo appeared in Austin Capitals sales materials.  KeyCorp and Victory Capital put the full weight of their names and reputation behind Austin Capital's representations to the ERB and SIC, which aided Austin Capital in its breach.

85.     Austin Capital's breach of fiduciary duty, as well as KeyCorp's and Victory Capital Management's aiding and abetting that breach, as alleged in Paragraphs 75 through 84, and in this First Amended Complaint generally, contributed to or were reasonably connected as a

significant link, or both, to the injuries and damages that the ERB and the SIC sustained in the Madoff scheme.

## COUNT II

### For Negligence (Against all Defendants)

86.     NEA-New Mexico realleges and incorporates Paragraphs 1 through 85 by reference.

87.     In providing services to the ERB and the SIC as a hedge fund of funds manager, Austin Capital owed the investing agencies a duty to possess and to apply the knowledge, care and skill of a reasonably well-qualified hedge fund of fund manager, and due diligence forms a part of the services to which the duty applies.

88.     Austin Capital, if it performed any due diligence with regard to the Madoff investment at all, negligently performed such due diligence, in breach of its duty.

89.     KeyCorp and the Victory Capital also owed the ERB and the SIC a duty to supervise the operations of Austin Capital in a manner reasonably calculated to have Austin Capital apply the knowledge, care and skill of a well-qualified hedge fund of fund manager. KeyCorp and Victory Capital negligently supervised the operations of Austin Capital, in breach of their duty.

90.     Defendants' negligence contributed to or was reasonably connected as a significant link, or both, to the injuries and damages that the ERB and the SIC sustained in the Madoff scheme.

## COUNT III

### For Punitive Damages
### (Against all Defendants)

91.     NEA-New Mexico realleges and incorporates Paragraphs 1 through 90 by reference.

92.     When, among other actions, it failed to disclose the material truth about its longstanding relationship with Madoff, failed to disclose the very fact of the investment with Madoff, failed to disclose the unconscionable triple-layer fee arrangement with Madoff and Tremont and failed to disclose its lack of meaningful due diligence regarding Madoff and BLMIS, Austin Capital acted intentionally and with knowledge that withholding such information from its clients was wrong. Austin Capital thus acted maliciously.

93.     When it failed to perform meaningful due diligence on the Madoff investment, Austin Capital knew that harm could result. Austin Capital thus acted willfully.

94.     By failing to perform meaningful due diligence with regard to the Madoff investment, while promoting its skill and focus on due diligence and while understanding that an important reason to hire a fund of funds manager is to perform due diligence, Austin Capital acted with utter indifference to the consequences of its conduct. Austin Capital's failure to heed the warning signs about Madoff that were readily available, such as the 2001 *Barron's* and *MAR/Hedge* articles, further evidences an utter indifference to the consequences of its conduct. Austin Capital thus acted recklessly.

95.     By establishing the bonus compensation scheme subsequent to the acquisition of Austin Capital that created a profit motive to turn a blind eye to Madoff—which is to say "skin

in the game," as a Victory Capital executive put it—and by promoting the mixing of sales and due diligence responsibilities in the same job, KeyCorp and Victory Capital Management acted maliciously, willfully or recklessly toward Austin Capital's clients.

96.    Additional facts showing that KeyCorp and Victory Capital Management acted maliciously, willfully or recklessly include the fact that the bonuses were, in part, grants of KeyCorp common stock and the fact that both KeyCorp's and Victory Capital's name and logo appeared in Austin Capitals sales materials.  KeyCorp and Victory Capital put the full weight of their names and reputation behind Austin Capital's representations to the ERB and SIC, which aided Austin Capital in its wrongful conduct.

97.    Because Austin Capital and the other KeyCorp Defendants acted maliciously, willfully or recklessly, while putting profit before client interest, the ERB and the SIC are entitled to an award of punitive damages, in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, on behalf of the Educational Retirement Board and State Investment Council, arms of the State of New Mexico, NEA-New Mexico prays that the Court:

A.    Award compensatory damages in favor of the ERB and the SIC in an amount to be proven at trial;

B.    Award punitive damages in an amount to be determined at trial;

C.    Award pre- and post-judgment interest as provided by law;

D.    Award NEA-New Mexico its costs of action and reasonable attorneys' fees under the common fund doctrine; and

E.      Such further relief as the Court deems just.

Respectfully submitted,

JONES, SNEAD, WERTHEIM
& WENTWORTH, P.A.

By: _____
JERRY WERTHEIM
JOHN WENTWORTH
JERRY TODD WERTHEIM
JOHN V. WERTHEIM
ROXIE P. RAWLS-DE SANTIAGO
Post Office Box 2228
Santa Fe, New Mexico  87504-2228
(505) 982-0011

TOM RHODES LAW FIRM
LAURA PAZIN-PORTER
126 Villita
San Antonio, Texas  78205
(210) 225-5251

*Attorneys for Plaintiff*
*NEA-New Mexico*

02243001\Austin Capital First Amended Complaint